Gerald O'Dell HENRICHS,
Plaintiff and Appellee,

v.

Marvella May HENRICHS, Defendant
and Appellant.

Nos. 15773, 15796.

Supreme Court of South Dakota.

Considered on Briefs March 21, 1988.

Decided June 29, 1988.

Wilson Kleibacker of Lammers, Lammers & Kleibacker, Madison, for plaintiff and appellee.

Thomas M. Issenhuth of Arneson, Issenhuth and Gienapp, Madison, for defendant and appellant.

SABERS, Justice.

Wife appeals award of alimony and property distribution. Husband appeals claiming excessive alimony award.

### Facts

Gerald (Jerry) and Marvella (Marvella) Henrichs were married in May of 1954. Three children were born; all were adults at the time of the divorce action. In 1966, Jerry bought the Triple F Feeds business in Ramona, South Dakota. Marvella assisted Jerry in the feed business. In 1978, Jerry became the State Manager for Triple F Feeds. This position required frequent travel and Marvella became responsible for most of the day-to-day operation of the feed store until 1982 when it was sold.

In 1979, Marvella and Jerry were involved in an automobile accident in which Marvella sustained serious personal injuries. She underwent surgery in 1981 to fuse three discs in her neck. In 1982, Marvella and Jerry received net settlement proceeds of $42,404.87.

In May of 1984, Jerry and Marvella purchased the cafe in Ramona for $32,000. They assumed an SBA loan of $25,000 and borrowed $7,000 from the Ramona Development Corporation. They invested another $16,000 in remodeling and improvements. Marvella has been exclusively responsible for running the cafe.

After thirty-two years of marriage, Jerry moved from the marital home and filed for divorce on the grounds of irreconcilable differences and extreme cruelty. Marvella counterclaimed for divorce based on extreme cruelty.

The trial court awarded a divorce to Jerry, upon consent of Marvella, based on irreconcilable differences. The trial court divided the property to award Jerry property valued at $81,731.83 and to award Marvella property valued at $74,916.27. After consideration for marital debts, Jerry's property had a net value of $44,387.83 and Marvella's property had a net value of $45,916.27. Marvella was granted alimony of $500 per month but no attorney fees.

### 1. PROPERTY DIVISION

Marvella claims the trial court erred by not granting her a lump sum settlement equal to the proceeds received in settlement of the personal injury action. She also claims the trial court made an inequitable division of the real and personal property of the parties.

■ Jerry argues that Marvella waived these issues by failing to cite authority for her arguments.[1] SDCL 15–26A–60(6); *Kostel Funeral Home, Inc. v. Duke Tufty Co.*, 393 N.W.2d 449 (S.D.1986). Marvella points out that *Kostel* holds that failure to cite supporting authority *may* result in the argument being deemed waived. Imposition of the waiver sanction may be appropriate when attorneys fail to uncover statutes and caselaw which could have been discovered with due diligence. In this case, we do not impose it and reach the merits

---

1. Jerry's assertion is buttressed by the following:

 Marvella's brief, page 14:
 "Our Courts have previously held that personal injury settlement proceeds are to be handled by a divorce Court the same as inherited property, and it should be considered the separate property of [Marvella]."

No supporting authority was cited. After Jerry's brief argued waiver for failure to cite authority, Marvella's reply brief, pages 6–7 stated:
 "This issue [award of personal injury settlement] is one of first impression in the State of South Dakota, and therefore there is no legal precedent available to be cited by Marvella in her brief."

because the question is sufficiently one of first impression.

### A. *Personal Injury Award*

■ Marvella claims that the trial court was incorrect in finding the damage award too remote in time and too long merged in the joint assets of the parties to be considered a distributable asset. Marvella argues that four years (1982–1986) is not too remote in time and that the proceeds are traceable. She claims that Exhibit J establishes the disbursement of the proceeds.[2]

The cases of *Wipf v. Wipf*, 273 N.W.2d 124 (S.D.1978) and *Fink v. Fink*, 296 N.W. 2d 916 (S.D.1980) appear to support the proposition that the settlement proceeds of personal injury suits are marital assets subject to distribution. In other jurisdictions, there are cases which hold such funds are marital assets, *In re Marriage of McNerney*, 417 N.W.2d 205, 206 (Iowa 1987) ("proceeds of a personal injury claim are marital assets, to be divided according to the circumstances of each case"); *Phillips v. Phillips*, 290 S.C. 455, 351 S.E.2d 178 (S.C.App.1986); *McDonald v. McDonald*, 19 Ark.App. 75, 716 S.W.2d 788 (1986); *Richardson v. Richardson*, 139 Wis.2d 778, 407 N.W.2d 231 (1987), and cases which hold the funds belong to the party injured and are not marital assets, *Regan v. Regan*, 507 So.2d 54 (Miss.1987); *Izatt v. Izatt*, 627 P.2d 49 (Utah 1981).

Jerry claims that the settlement award was made to the parties jointly and that all of the money has been spent so that there no longer remains an asset to be divided. We believe four years is not too remote under these circumstances and that settle-ment proceeds are marital property subject to distribution. However, whether the distribution constitutes an abuse of discretion depends on the entire property division.

### B. *Real and Personal Property*

Marvella claims the property division is inequitable because Jerry received the marital home (valued at $27,500) and business property which included a building capable of generating $350 per month rental income while she received the cafe (which has less value than debt) and a one-half interest in the present value of Jerry's profit-sharing trust[3] which is not currently available to her.

Jerry argues that Marvella cannot complain about the award of the marital home because she told the trial court she wanted either the house and the "horse area" or neither. The horses were Jerry's hobby and the area behind the house, used for pasturing and exercising the horses, was of no interest or use to her. She now argues that Jerry could have found another place for the horses if the trial court had awarded both properties to her. Jerry also asserts that she asked the trial court to award her the Cadillac which she now complains is merely a "depreciable" asset.

■ The trial court must consider equity and the circumstances of the parties when it divides marital property. SDCL 25-4-44; *Cole v. Cole*, 384 N.W.2d 312 (S.D.1986); *Garnos v. Garnos*, 376 N.W.2d 571 (S.D.1985). The principal factors to be considered in determining an equitable property division are: "the length of the marriage; the value of the property; the

---

2. Exhibit J shows the following disbursement of the $42,404.87 in net proceeds:

| | |
|---|---|
| American State Bank: pay off of home mortgage, vehicle loans and other indebtedness and interest | $31,447.54 |
| Campbell Supply (Jerry's account) | $ 80.81 |
| Tuition for son | $ 2,274.82 |
| To other son | $ 1,000.00 |
| To daughter | $ 1,000.00 |
| Savings [subsequently withdrawn and used for family support] | $ 3,000.00 |
| Utility | $ 55.92 |
| VISA (Jerry's account) | $ 1,072.50 |
| Lumber yard | $ 264.19 |
| Joint checking | $ 2,209.90 |

3. According to Jerry's testimony and Exhibit # 10, the profit-sharing plan of Triple F Feeds, Inc. is a stock ownership plan. At the termination of his employment, he will receive shares of stock equal to the amount due to him. The actual monetary amount Jerry will receive is dependent upon the market value of the shares. Additionally, the amount in the profit-sharing plan is subject to reduction by company losses. Exhibit # 10 shows Jerry's "total vested amount" dropped from $33,853.38 to $29,763.66 because of a $6,355.28 loss in 1984/1985.

age and health of the parties; their respective competency to earn a living; the contributions of each party to the accumulation of the property; and the income producing capacity of the parties' assets." *Cole, supra* at 314 (*citing Clement v. Clement*, 292 N.W.2d 799 (S.D.1980)).

In this case:

1) The parties were married for thirty-two years.

2) The trial court valued the property awarded to Jerry at $81,731.83 (net value—$44,387.83) and the property awarded to Marvella at $74,916.27 (net value—$45,916.27).

3) At the time of the divorce, Jerry was fifty-one years old and Marvella was forty-nine years old. The trial court found both parties were "able bodied, in good health." It appears from the testimony that the 1981 surgery removed the substantial disability which Marvella incurred as a result of the 1979 accident.

4) The trial court found both parties were capable of earning a living wage.

5) The trial court did not make a specific finding as to the contributions of each party to the accumulation of property, however, the award of approximately equal net amounts may indicate that the trial court found an equal contribution.

6) In essence, Jerry was awarded his business and the home and Marvella was awarded her business. His profit sharing plan was divided equally. The trial court commented that Jerry's business income had been adversely affected by the poor farm economy and that Marvella could use food purchased for the cafe at home.

The trial court has broad discretion in making a division of the marital property and its judgment will not be set aside absent a clear abuse of discretion. *Goehry v. Goehry*, 354 N.W.2d 192 (S.D.1984). Upon reviewing Marvella's objections, we find that the trial court did not abuse its discretion. The trial court should have been less concerned with Marvella's ultimatum and might have granted the home to the wife

and the "horse area" and entire retirement trust to the husband, but we are not prepared to say its failure to do so was an abuse of discretion.

## 2. ALIMONY

Marvella argues that the trial court erred in awarding her alimony of only $500 per month. Although she concedes that Jerry's income from his feed business has been reduced in recent years because of the poor agricultural economy, she contends the trial court's award is too low when Jerry's *average* income over the past five years is considered. She claims the parties have disproportionate earning capacities. Her argument appears to be based on the belief that Jerry's income will increase, but the income from the cafe will remain break-even or decline.

Marvella claims that based upon the disproportionate earning capacities of the parties, the inequitable property division and her physical limitations as a result of the car accident, the trial court should have either set alimony at a higher monthly amount or, in addition to the amount awarded, granted her a certain percentage of Jerry's income after a predetermined income figure.

Jerry also appeals the alimony award and claims it is excessive. He claims he does not have substantial income. He claims that, based upon his tax returns for 1982 through 1985 and his pay stubs for the first six months of 1986, he has a taxable income of $899.30 per month (without deduction for his living and other expenses).

Jerry also claims Marvella is fully capable of earning the $890.50 per month she needs for living expenses. He points to her skills and abilities as a bookkeeper and secretary, carpenter and home remodeler, and cafe operator. Marvella counters that these skills have not been utilized for thirty years. Jerry appears to confuse Marvella's ability to do some remodeling on their home and the cafe with remodeling skills saleable in the competitive job market. He claims that the equitable division of marital assets places them in the same economic position and that, in light of her needs and

income, the trial court abused its discretion in awarding her $500 per month alimony.

The trial court has broad discretion in awarding alimony, but "must rest its decision upon several factors as they appear material to the facts and circumstances of each specific case." *Straub v. Straub*, 381 N.W.2d 260, 261 (S.D.1986). The factors to be considered are: " '(1) the length of the marriage; (2) their respective earning capacity; (3) their respective financial condition after the property division; (4) their respective age, health and physical condition; (5) their station in life or social standing; and (6) the relative fault of the parties in the termination of the marriage.' [4] [citations omitted]" *Arens v. Arens*, 400 N.W. 2d 900, 901 (S.D.1987).

"The trial court's award of alimony and the division of property *are considered together* on appeal to determine whether the trial court abused its discretion. [citations omitted]" *Goehry, supra* at 194 (emphasis in original).

We hold that the trial court's award of $500 per month in alimony was not an abuse of discretion. The parties were married for a lengthy period of time. During the marriage, Marvella contributed substantially to the growth and success of Jerry's business. Although Jerry's business has been less economically successful of late, he continues to derive a substantial income from it. The cafe, on the other hand, is a relatively new business and its continued viability is, therefore, more speculative. Under the facts as they existed at the time of trial, it was not an abuse of discretion for the trial court to award alimony to Marvella. Although the cafe may provide food, Marvella must now provide for her own housing. The trial court considered Marvella's present physical condition in making the alimony award. The alimony award of $500 per month is neither excessive nor insufficient. Should a material change of circumstances occur in the future, either party has the right to seek a modification of the award.

4. The trial court did not consider fault in its determination as it found that each party had

## 3. ATTORNEYS' FEES

Marvella claims the trial court erred in failing to award her attorney's fees. She argues that Jerry instituted the divorce action and she was forced to hire counsel to protect her rights. She also argues that Jerry caused the breakup of the marriage, his earning ability exceeds hers, and she does not have cash assets or income sufficient to pay her attorney's fees.

Jerry contends the trial court did not abuse its discretion in requiring each party to pay their own attorney's fees. He argues that she had sufficient liquid assets to pay her own attorney's fees because she received temporary alimony of $300 per month prior to the final decree and was awarded $4,134.44 (one-half of a tax refund check).

On review, this court will examine the trial court's analysis of the following elements pertinent to fixing legal fees generally: (1) the amount and value of the property involved; (2) the intricacy and importance of the litigation; (3) the labor and time involved; (4) the skill required to draft pleadings and try the case; (5) the discovery procedures utilized; (6) the existence of complicated legal problems; (7) the time required; (8) whether briefs were required; and (9) whether an appeal to this court is involved. [citations omitted.]

*Cole, supra* at 317.

 The trial court should also consider the property owned by each party, their respective incomes, the liquidity of the moving party's assets and whether either party unreasonably increased the time spent on the case. *Id.; Harvey v. Harvey*, 383 N.W.2d 862 (S.D.1986); *Garnos, supra*. The decision to award attorneys' fees is within the sound discretion of the trial court. *Wallahan v. Wallahan*, 284 N.W. 2d 21 (S.D.1979).

 The trial court found that each party was employed, was "receiving assets," and should pay his or her own attorney's fees. Findings which do not clearly ad-

contributed equally to the irreconcilable differences.

dress the factors to be considered make appellate review of the trial court's decision difficult. However, the court expressly considered several of the relevant factors and the record does not indicate that either side unreasonably increased the time spent on the case. Therefore, we hold there was no abuse of discretion.

We affirm.

WUEST, C.J., concurs.

HENDERSON, J., concurs in part and dissents in part.

MORGAN and MILLER, JJ., dissent.

HENDERSON, Justice (concurring in part, dissenting in part).

I concur in the property distribution; I dissent on the $500 alimony award unto wife.

| JERRY AWARDED | MARVELLA AWARDED |
|---|---|
| Divorce (irreconcilable differences) | $500 Alimony (no automatic termination for remarriage, *i.e.*, "open-ended") |
| $81,731.83 gross | $74,916.27 gross |
| $44,387.83 net | $45,916.27 net |

Marvella has excellent health and skills as follows: She is a competent business-woman; she has good typing and book-keeping skills; she can cook in a restaurant; she has displayed carpentry ability; she has participated in recent painting, ceiling work, and paneling; educationally, she possesses a high school education. Jerry's taxable income dropped dramatically due to agricultural hard times, to $5,529 in 1985. Exhibit 9 reflects his net earnings through the first six months of 1986. This equates to $899.30 per month disposable income. With said $899.30, Jerry must pay rent, utilities, food, medical, dental, optometric, and hygiene items for normal living expenses. He has an eighth-grade education. Conclusion: Jerry, if he must pay $500 per month, will not have enough money to live on; $500 is totally unrealistic for his income. This award is not only unrealistic, it is an economic disaster.

The trial court went out of its way to make a finding that there was a general poor farm economy and that it had resulted in a reduction during the last few years of his income. Under all of the circumstances, namely, that Jerry does not have the ability to pay over 50% of his taxable income in alimony, this is a clear abuse of discretion. *Goehry v. Goehry*, 354 N.W.2d 192 (S.D.1984); *Herndon v. Herndon*, 305 N.W.2d 917, 919 (S.D.1981) (Henderson, J., concurring in part, dissenting in part). She is able to make a living in life and so is he. Finding of Fact 10 states: "That both Plaintiff and Defendant are able bodied, in good health, and capable of earning a living wage and both were working full time prior to the commencement of the action." An alimony award here, if any, should have been a rather insignificant supplement to the defendant rather than an economic penalty of gigantic proportions simply because Jerry is of the male gender. This is another instance of "flail the male."

Actually, Marvella's advocacy approaches Marxism: Produce, husband, by your ability but distribute according to my (desired) need. "If you earn more, or can earn more, you pay me, proportionately, what you earn." These quotes aforesaid are mine, not Marvella's, and represent the depraved economic philosophy attendant. Simply that he has a possibility, through the free enterprise system, of earning more money than she (if the crops are good) in a feed business, is not an equitable or just mooring for alimony. Another domestic theory to advocate, in these divorce cases, is as follows: "Let us even up our income receipts, whatever might be our ability." In essence, this is the antithesis of the American dream. For, indeed, we are all equal in the eyes of God, as taught to us by the Scriptures; and we are all equal in the eyes of the Law, as guaranteed by the Bill of Rights, see particularly the Fourteenth Amendment to the United States Constitution (equal protection of the laws), but we are not all equal in ability. When the Declaration of Independence was issued on July 4, 1776,[1] it stated, *inter alia:* "We

---

1. This historic document is not law per se, but expressed the intention of the representatives of the United States of America, in general Congress assembled, that the colonies ought have the right to be free and independent states, and

hold these truths to be self-evident: that all men are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness." Therefore, the courts should not become an unwitting tool to any type of Marxist economic philosophy. To do so, would be to foreswear our historical inheritance. If, as suggested by the briefs, she needs $890.50 per month to make a living, she has that ability. She is a strong, healthy, and talented woman; if he is required to pay $500 per month, then this leaves her but $390.50 to earn per month. Such an award strips from her such indefinables as pride in her own work ethic and one of the basics that this country was founded upon: self-reliance. Our constitutional heritage is rarely cited in the law. Rather, emphasis seems to be placed upon statutes and precedent in the courts. Obviously, they are both sources of the law. But any sovereign state, and its judges, if it and they are worth their salt, must refer to not only the national constitution and its express purposes, but also the state constitution which blueprints the path of the law for the lawyers, judges, and courts to follow. I particularly refer, at this time, to art. VI, § 27, of the South Dakota Constitution, which states: "The blessings of a free government can only be maintained by a firm adherence to justice, moderation, temperance, frugality and virtue and by frequent recurrence to fundamental principles." Self-reliance is an old fundamental principle which brought the settlers and the pioneers through hard times and literally won the West. Pray tell, how does alimony, when you do not need it, fit in with self-reliance? Self-reliance carries a strong indication of independence and of trust in oneself. It suggests courage and backbone. Reliance, in contrast, suggests dependence upon another person or a lack of confidence or one's own weakness to such extent that external support is required. Reliance implies you must have a clinging hand. Marvella need not cling to Jerry in this case. She needs no external support. It is imposed upon her by the

absolved from any allegiance to the British crown.

trial court and approved by this Court. It makes her deviate from the fundamental principles that this state and nation were founded upon. Therefore, it serves her ill as a human being. So an award of alimony here is founded more upon Marxist principles than it is upon the fundamental principles of the Founding Fathers or our state constitution.

I have scoured the findings of fact and conclusions of law, not to mention the Divorce Decree entered herein. There are no findings of fact entered herein upon which to predicate an alimony award. Finding of Fact 17 states: "The Court finds that each of the parties being employed and receiving assets herein shall pay his or her own attorneys fees, costs and tax incurred as a result of this action." Finding of Fact 18 states: "Each of the parties is capable of and should pay any other debts incurred by the parties after the commencement of this action." Does this sound like an alimony award should be granted herein? I think not. Out of the blue, with no rationale or substantiation that I can find, is entered Conclusion of Law 6, which succinctly states: "That Defendant is entitled to alimony in the sum of Five Hundred Dollars ($500.00) per month." Substantively, Conclusion of Law 9 militates against an alimony award in Conclusion of Law 6. It states: "That each of the parties herein are working full time and capable of earning a living wage, *have assets* and not only have the ability to pay but should pay their respective attorneys fees, costs and tax incurred as a result of this action." (Emphasis added.) We should all remember, as I have tried to point out in the past, that this entire concept of granting alimony as an incident to divorce arose from English ecclesiastical law. It cannot be questioned that a wife's need was greater in old England, because a husband was given great control over a wife's property. A lack of employment existed for women when alimony was birthed. A lack of employment opportunities for married women existed. As I have written in the past, the law and social conditions have vastly changed since

the days of the ecclesiastical court in England. For a collection of alimony writings in this Court, see *Baltzer v. Baltzer*, 422 N.W.2d 584, 589 (S.D.1988) (Henderson, J., concurring specially) (48 in all, spanning a period of nearly ten years).

If my previous expressions in this dissent are a form of anti-majoritarianism, with dissents and special writings as a firmament, then to sustain this dissent which is to reverse an unjust $500 alimony award, I now theoretically posit the following dissertation. Criteria have heretofore been established for an award of alimony in this state. *See Guindon v. Guindon*, 256 N.W. 2d 894, 898 (S.D.1977). *Accord: Stubbe v. Stubbe*, 376 N.W.2d 807, 808 (S.D.1985). They are: (1) length of marriage; (2) respective earning capacities of the parties; (3) respective financial condition of the parties after the property division; (4) respective age, health and physical condition of the parties; (5) the parties' station in life and their social standing; and (6) relative fault of the parties in the termination of the marriage. *Guindon, id.* at 898; *Stubbe, id.* at 808. The trial judge fastened onto Jerry's potential gross income as distinguished from his recent net income. There appear to be no findings of fact and conclusions of law which specifically follow the *Guindon* holding. Example: There is certainly no showing that either one have a certain type of social standing to maintain. It clearly appears that the trial judge determined that the respective financial condition of the parties *after the property division* was such that the parties had a standard of living as good as enjoyed before the divorce. Hence, this standard within the rule seems to have been violated. The good health that both enjoyed appears to have been considered, but when alimony was awarded, that factor seems to be disregarded. Need I mention that more than half of all married women are in the labor force. *See Statistical Abstract of the United States* 399 (1985), reflecting that in 1984, 52.8% of married women living with their husbands were in the labor force. Even more astounding

figures are demonstrated: 61.1% of separated women and 74.3% of divorced women were in the labor force. 2 H.H. Clark, Jr., *The Law of Domestic Relations in the United States*, § 17.1, at 223 n. 21 (2d ed. 1987).

Examining the last two decades, Professor Clark points out that married women's full legal capacity to own and control their own property (unknown when alimony was birthed in England), which has triggered an increased participation in employment outside of the home, creates doubts about the wisdom of alimony generally and particularly about its duration. Clark, *supra* § 17.1, at 221. I have quoted a Drake Law Review article, R.S. Sackett & C.K. Munyon, *Alimony: A Retreat from Traditional Concepts of Spousal Support*, 35 Drake L.Rev. 297 (1985–86), before. *See Lodde v. Lodde*, 420 N.W.2d 20, 26 (S.D. 1988) (Henderson, J., dissenting). One of the interesting sections of this law treatise concerns payment of alimony to the husband. "Receipt of Alimony by the Husband: Does Eve Pay Adam?", Sackett & Munyon, *supra*, at 319. Why is it that we do not see trial judges in South Dakota awarding alimony to the husband? Is it not supposed to be *equal* justice under the law? *See Orr v. Orr*, 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979) (statutes allowing only wives to seek alimony inherently risk reinforcing stereotypes about the "proper place" of women and their need for "special protection," and are unconstitutional). In South Dakota, we have an asexual statute referring to a "party." SDCL 25–4–41. Legally, under this statute, husbands could secure alimony from an ex-wife. In practice, it does not happen. Why do these awards to ex-wives become automatic? Why do we continue to punish ex-husbands? Here, Marvella is not going to become an economic burden on society. Some states have curtailed or limited by statute alimony awards. Sackett & Munyon, *supra*, at 301 n. 30 (Delaware, Indiana, Kansas).[2] Texas does not authorize alimony awards. However, this Court has consistently liberalized alimony awards

**2.** I appreciate that this has not been done in this state.

by its past decisions and it strikes me that we are going against the social conditions of the day and the flow of history itself. Therefore, I respectfully dissent on alimony.

MILLER, Justice (dissenting).

I dissent. I would reverse on the property division and attorney fee issues and remand for further consideration.

## PROPERTY DIVISION

Although the raw monetary figures may indicate that an equitable division of the marital property was made, an examination of the record reveals a most inequitable result. Marvella ended up with a marginal cafe business (which she does not want) and no home (which she wants). Jerry continues with his viable, successful business, plus the marital home and a place for his horses.

It should be remembered that the house was substantially paid for by Marvella from the proceeds of the settlement of the personal injury suit.[1] As noted by the majority, from the settlement proceeds she, among other things, paid off the mortgage on the home ($31,215), in addition to paying over $1,000 on Jerry's *business* VISA account and placing over $5,000 in their bank accounts. Further, she apparently is the person who did all of the fixing and remodeling on the house and took care of it, in addition to performing the typical wifely and motherly functions for the family.

Marvella asserted that she should receive both the home and the adjoining property (Jerry agreed that she should have the home) because she did not want to be required to see Jerry constantly driving through the yard and working and playing with his horses. I disagree with the major-

ity's characterization of her testimony as an "ultimatum." She did state that if she could not have the land behind the house she could "just as well give up the house as well." She seemed to reason that it would be unfair for her to have to maintain all the property for the benefit of his horses.[2] She strongly asserted many good reasons why she should receive *all* of the property encompassing the marital residence. The sole reason asserted by Jerry (for receiving the adjoining property) was that he needed or wanted it to work with his horses—a fun, yet very expensive hobby.

To give Jerry a home for his horses and at the same time to deny Marvella the marital home is not only an abuse of discretion but is also manifestly unfair. Are not the priorities somewhat confused here?

Further, the trial court gave Marvella the cafe in Ramona. Big deal!! Even considering its property value, the trial court decision overlooks the cafe's marginal worth. Although characterized as a going concern, the cafe is hardly a money-making venture (for example, for the first six months of 1986 it made a $208 profit[3] ($24 per month)). Considering the great amount of work and large number of hours (approximately twelve hours per day) required by Marvella to work in the business, coupled with the minimal returns therefrom, it clearly appears that she did not receive an appropriate share of the marital property. If the cafe has the worth Jerry suggests, perhaps he should take it (after all, it was his idea to purchase it in the first place)—or perhaps it should be sold with the proceeds appropriately divided (although it should be observed that Marvella has been unsuccessful in her attempts to sell the cafe).

1. Jerry argues that it was a joint award, because he was involved in the accident. However, he agrees that she, not he, was the one who was injured.

2. When asked why she objected to Jerry having the back area for the horses, she said:
 A Lack of privacy mostly. If he doesn't want to be included in the other responsibilities of the place, I do all the mowing and spraying and fixing and cleaning and everything else of the yard and whether I am inside the house, the kitchen windows are all facing the area where they are riding and roping and if I am out in the yard, they are all right there within like I say, 100 steps of the yard.

3. In calculating profit there has been no deduction for a salary for Marvella. Therefore, she has, in reality, worked for almost no compensation.

Further, I believe that unless the property is reallocated in an equitable manner, the sum of $500 is an inadequate amount for alimony, considering all of the foregoing.

### ATTORNEY FEES

As the majority states, the trial court's findings do not clearly address the settled factors to be considered in awarding attorney fees. We have been prevented from having a meaningful appellate review. I would remand for an appropriate consideration, findings and ruling under our previously established guidelines.

I am authorized to state that Justice MORGAN joins in this dissent.